# EXHIBIT 1

Complaint in Initial Lawsuit

MITCHELL J. LANGBERG, ESQ.
Nevada Bar No. 10118
abult@bhfs.com
ERIC D. WALTHER, ESQ.
Nevada Bar No. 13611
ewalther@bhfs.com
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV 89106-4614
Telephone: 702.382.2101
Facsimile: 702.382.8135

*Attorneys for Capital Pure Assets, LTD*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| CAPITAL PURE ASSETS, LTD, a Nevada limited liability company, <br><br> *Plaintiff,* <br><br> v. <br><br> CC TECHNOLOGY CORPORATION, a Colorado corporation; DOES 1 through 10, inclusive; and ROE CORPORATIONS 1 through 10, inclusive, <br><br> *Defendants*, | CASE NO.: <br><br> **COMPLAINT AND JURY DEMAND** |

Plaintiff Capital Pure Assets, LTD ("CPA"), by and through its attorneys of record at the law firm Brownstein Hyatt Farber Schreck, LLP, hereby complains against Defendant CC Technology Corporation ("CCTC") as follows:

## PARTIES

1. CPA is a Nevada limited liability company with a principal place of business in Las Vegas, Nevada. Each of its members is a citizen of the State of Nevada.

2. CCTC is a Colorado corporation with a principal place of business in Boulder, Colorado.

**<u>JURISDICTION AND VENUE</u>**

3.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332 because there is complete diversity of citizenship between CPA and CCTC and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.     Venue is proper in this Court under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district. Specifically, the agreement that gives rise to this action was entered into after negotiations that took place, in part, in this district and was to be performed, in part, in this district.

**<u>GENERAL ALLEGATIONS</u>**

5.     CPA is a boutique investment firm that partners with companies to provide growth capital, meticulous project execution, and strategic planning.  CPA's members have decades of experience and have carved out a niche in sectors ranging from hospitality and hospital technologies to real estate development, immerse media, aerospace and defense, financial services, and sustainable development in water and energy.  CPA is a family-run business, with Shiva Prakash serving as its Chairman, Hannah Dawn Prakash serving as its Chief Executive Officer, and Vikhyat Prakash serving its Strategic Advisor.

6.     CCTC purports to be an investment management company that claims to actively manage several profitable projects in various industries.  Thomas Gavin IV serves as CCTC's Chief Executive Officer and Terrence Patton serves as the Chairman of its Board.

**A.  CCTC approaches CPA about forming a joint venture.**

7.     In May 2023, CCTC approached CPA about partnering on a joint venture to pursue investments.

8.     CCTC principals Mr. Gavin and Robert Lang traveled to Las Vegas, Nevada from May 22-23, 2023 to discuss a possible joint venture with CPA.  Mr. Gavin and Mr. Lang returned to Las Vegas again from May 29-31, 2023 to continue those discussions.

9.     Under the proposed arrangement, CCTC would bring CPA potential projects that have a high probability of commercial success and profitability.  CPA would then provide capital for the projects using Standby Letters of Credit ("SBLC")—which are described in more detail

2

below—and the parties would split any profits 50/50.

10. In proposing this arrangement, CCTC represented to CPA that it had extensive experience managing successful projects like the ones that it would bring to the proposed joint venture.

11. CPA was interested in the proposed joint venture, but only if CCTC could actually deliver quality investment projects as promised. To that end, CPA provided CCTC with a document titled Business Submission Criteria for Invent Considerations, which listed important parameters that CPA would evaluate and approve before CPA would consider any proposed project to be viable. Those parameters included, among many other things, the proposed project's mission statement, what capital was needed and how it would be used, information on the relevant industry and target market, and the likely exit strategy.

**B. CCTC proposes that the parties invest in a cannabis company, but CPA declines to invest based on concerns over the project's viability.**

12. CCTC proposed that the parties form a joint venture to invest in a cannabis company called Cannatrac Financial Corp. ("Cannatrac").

13. After reviewing Cannatrac's pitch deck and financials, however, CPA determined that Cannatrac was not a viable investment. Specifically, CCTC failed to demonstrate that Cannatrac could generate sufficient revenue and no major banks would approve cannabis based investments. CTCC also failed to provide any viable business documents in the form of contracts to back the projections in the pitch deck.

14. As such, CPA declined to form a joint venture with CCTC to pursue the investment in Cannatrac.

**C. CCTC proposes that the parties invest in a Chicago real estate project.**

15. On June 1, 2023, CCTC proposed that the parties form a joint venture to invest in what it promised to be a lucrative real estate project.

16. The project—titled the Timber Development—involved the purchase of a large historic building in downtown Chicago that would be converted into Class A multifamily residences. The pitch deck provided by CCTC promised impressive investor returns, based in large

3

part to the building's close proximity to both Google's new Chicago headquarters and roughly 80,000 students.

17. The pitch deck claimed that the Timber Development was moving forward and was actively seeking capital investments.

18. On June 7, 2023, CCTC arranged for a video call to discuss the Timber Development. The video call was attended by Vikhyat Prakash and Shiva Prakash of CPA, Mr. Gavin of CCTC, and Kevin Seivers, the realtor who ran the real estate firm that had assembled the Timber Development investment.

19. During that call, CCTC intentionally led CPA to believe that the Timber Development was proceeding and that the investors were in a position to purchase the building.

20. CCTC also represented that it had strong relationships with labor unions that would help facilitate the building's renovation and conversion into Class A multifamily residences.

21. CCTC represented that the Timber Development was projected to result in a total profit for the Joint Venture of approximately $80,000,000.00, meaning that CPA's projected profit from the project would be approximately $40,000,000.00 under the parties' 50/50 split.

22. After several discussions with CCTC regarding the Timber Development, and based on CCTC's representations that the Tiber Development was ready to proceed and that CCTC had strong labor union relationships that would help facilitate the project, and with CCTC's additional promise of providing other lucrative projects in the future, CPA agreed to form a joint venture with CCTC and to provide capital for the Timber Development and other acceptable projects through the use of an SBLC.

**D. Background on how SBLCs works.**

23. An SBLC serves as a financial safety net offered by banks. It is a guarantee of payment issued by a bank on behalf of a client, ensuring that the beneficiary receives payment in the event that the client fails to fulfill their contractual obligations.

24. There is a cost associated with issuing an SBLC that must be paid back to the issuing bank no matter how the SBLC is ultimately used.

25. Once an SBLC is obtained, it can be used as collateral to borrow money to fund a

project. This is known as "monetization" of the SBLC. In other words, a lender—usually a bank—will loan money to fund the project, and if the borrower us unable to repay the loan, the lender can draw from the SBLC to recoup its money.

26. When loan funds are received from the monetizing bank, some of those loan funds are paid to the bank that issued the SBLC to cover the cost of the SBLC, and the remaining loan funds are sent to the borrower to use on the project. The borrower must then repay the total loan amount received from the monetizing bank.

27. In addition to the cost of the SBLC, the process of obtaining and monetizing an SBLC also involves several fees. These fees can include, among others, applications fees, issuance fees, annual fees, confirmation fees, advising fees, amendment fees, and cancelation fees.

28. Importantly, the SBLC process cannot be completed until there is a viable project that is ready to receive capital. Specifically, the SBLC issuer needs project information in order to complete its risk assessment and to negotiate the terms of the SBLC and associated fees. And even with an SBLC as collateral, the monetizing bank will not loan money against the SBLC unless it is funding a project that will, at least theoretically, result in a return that will allow the borrower to repay the loan.

29. Based on its representations of being a sophisticated investment company, CCTC either knew or should have known that the SBLC process cannot be completed until there is a viable project that is ready to receive capital.

### E. The parties execute the Joint Venture Agreement.

30. Based on CCTC's express representations related to Timber Development, and the promise of other viable projects in the future, CPA agreed to execute a Joint Venture Agreement with CCTC ("JVA") on June 26, 2023, which created the joint venture ("Joint Venture").

31. In the JVA, CCTC represented that "it has various projects and businesses under management" and that it "is confident in its portfolio projects companies."

32. CCTC further represented that it was "ready, willing, and able to receive [the] cash pool generated by [CPA's SBLCs]," including "a line of credit Twenty Million Dollars $20,000,000 to be used exclusive to grow the portfolio companies of [CCTC]."

33. The JVA required CCTC to pay fees associated with monetizing the SBLC, and to place those funds in an escrow account until needed to pay the necessary fees.

34. The JVA also stated that both CCTC and CPA would receive a "50/50 profit share of the all the business of [CCTC]."

35. Section 3 of the JVA set forth the procedure for obtaining capital for funding the Joint Venture's projects:

A. Deposit of Escrow: within one (1) banking day upon signing this agreement [CCTC] will fund Escrow account.

B. Verification of Escrow: [CPA's] escrow attorney will verify the funds are clean and unencumbered funds and have been deposited into the nominated escrow account as in Annex 1.

C. SBLC Verbiage and Application Process: [CPA] will instruct [its] bank to start the SBLC process of issuance … [w]hich includes allocating cash funds, communicating with the credit risk departments of the bank and other ancillary activities.

D. SBLC Pre Advice: [CPA] will instruct the bank to send a MT799[1] Pre-Advice message to the monetizer's bank. This will be a conditional block of funds message.

E. Issuance of MT760: [CPA] will instruct their bank to send the SBLC via MT760[2] directly to the Monetizer's Bank. At this point Escrow Funds are released to the bank to pay for this transmission of the SBLC to monetizer bank.

F. Monetization of SBLC: Monetization will follow the monetization term sheet provided in Step E. Generally, monetization will occur within 21 days of receiving the SBLC Instrument. Once Monetization is done [CCTC's] loan amount is deposited into their nominated bank account.

36. In other words, once CCTC deposited sufficient funds into escrow to cover the associated fees (Step A above), and the escrow funds were verified by CPA (Step B above), CPA

---

[1] A SWIFT MT799 is a message sent between banks which confirms funds or proof of deposits on a potential transaction.

[2] A SWIFT MT760 is a "bank-responsible guarantee" that is sent between banks involved in the issuance of a guarantee. It is used to issue a guarantee by a bank on, among other things, SBLCs.

6

would begin the process of leveraging its banking relationships to obtain an SBLC from its bank (Step C above).

37.     Importantly, however, for the process to be completed, including monetization—i.e., receiving cash loan proceeds from a bank that uses the SBLC as collateral (Steps D-F above)—the parties needed to have an actual project that was ready to receive capital. Indeed, the bank issuing the SBLC needs project information to complete its risk assessment and to negotiate the SBLC terms. Moreover, the mere issuance of the SBLC will require the cost of the SBLC to be repaid—which would be tens of millions of dollars—regardless of whether the SBLC is ultimately monetized. And no bank will monetize the SBLC unless the loan proceeds will actually be used for something that can generate a return. For these reasons, the SBLC process cannot be completed until the parties have a viable project that will generate a return.

38.     This should not have been a problem, however, because CCTC represented that the Timber Development was a viable investment that was ready to receive capital. As such, CPA's bank should have been able to process the SBLC and send it to the bank associated with the Timber Development for monetization without delay.

39.     CCTC also knew, or should have known given its representations of being a sophisticated investment company, that the SBLC process and monetization for any future projects could not be completed until the project was ready to receive capital.

**F.     CPA fully performs under the JVA by starting the SBLC process, but the process cannot be completed because CCTC does not actually have any viable projects to fund.**

40.     In accordance with JVA Section 3(A), CCTC placed $336,000.00 into escrow merely to pay the processing and similar fees associated with an SBLC in the amount of $20,000,000.00.

41.     Upon information and belief, CCTC did not have the ability to meet this small part of the overall financial commitment on its own and, instead, obtained a high interest, hard money loan from a third-party lender to fund the escrow.

42.     Once the escrow funds were confirmed, CPA performed under JVA Section 3(C) by

7

"instruct[ing] [its] bank to start the SBLC process of issuance … [w]hich includes allocating cash funds, communicating with the credit risk departments of the bank and other ancillary activities."

43. CPA's bank was fully prepared to issue the SBLC for the full amount promised, but needed project information to proceed, which CCTC was responsible for providing.

44. Unfortunately, however, the Joint Venture could not move forward with the Timber Development. After signing the JVA, CCTC failed to provide any documentation or proof that the Timber Development was ready to proceed or that the project even had the ability to purchase the historic Chicago building. CCTC also failed to provide any proof of its purported labor union relationships that would have facilitated the renovation and conversion of the building into Class A multifamily residents.

45. Because CCTC could not provide any documentation or proof that the Timber Development was actually proceeding, CPA could not complete the SBLC process.

46. In other words, to the extent the Timber Development was ever a viable investment, CCTC's failure to provide any documentation or proof of the project's viability is the only reason the SBLC process could not be completed.

47. Although disappointed that the Timber Development fell through, CPA explained to CCTC on numerous occasions that the SBLC was still available to use for the other viable projects that CCTC promised it would bring to the Joint Venture. Once an acceptable project was ready to receive capital, CPA's bank would process the SBLC and send it to the bank associated with the project for monetization.

48. CPA and its bank were always ready, willing, and able to proceed with monetization of the SBLC for the full amount promised as soon as an acceptable project was ready to receive capital.

49. Unfortunately, however, CCTC did not have any other viable projects to bring to the Joint Venture as promised.

50. This was a direct contradiction to CCTC's representations in the JVA that "it has various projects and businesses under management" and that it "is confident in its portfolio projects companies."

8

51. It was also a direct contradiction to CCTC's representations in the JVA that it was "ready, willing, and able to receive [the] cash pool generated by [CPA's SBLCs]," including "a line of credit Twenty Million Dollars $20,000,000 to be used exclusive to grow the portfolio companies of [CCTC]."

52. Because there were no investments for the Joint Venture to pursue, CCTC originally decided to abandon the Joint Venture on September 21, 2023, and requested the return of the funds it placed in escrow. CCTC claimed that "time restrictions on [its] money" required the return of the escrow funds.

53. Upon information and belief, CCTC was receiving immense pressure from the third-party lender that provided CCTC with the high interest, hard money loan to fund the escrow. This pressure was of CCTC's own making, however, because: (1) it was CCTC's decision to obtain a loan to fund the escrow, and (2) CCTC's failure to secure a viable project was the only reason the SBLC had not yet been monetized.

54. On September 29, 2023, however, CCTC reversed its position and confirmed that it wanted to continue with the Joint Venture and would still provide viable projects as promised.

**G. CCTC abandons the Joint Venture without providing a single viable project to invest in.**

55. On March 1, 2024, CCTC informed CPA that it was again abandoning the Joint Venture and demanded the return of its escrow funds.

56. Incredibly, CCTC also sent CPA a demand letter claiming that CPA had breached the JVA by not obtaining capital for the Joint Venture.

57. CCTC claims that the alleged failure of the Joint Venture has caused it damages for, among other things, lost Joint Venture opportunities, amounting to several millions of dollars. Reserving CPA's contention that any claimed damages for purported lost opportunities are too speculative to be cognizable, if any damages have been suffered, it is *CPA* who has incurred damages because the loss of any joint venture opportunity is the result of CCTC's breaches and bad acts. Again, the only thing preventing the SBLC process from being completed was CCTC's failure to provide the Joint Venture with viable projects as required under the JVA.

9

## FIRST CAUSE OF ACTION

### Breach of Contract

58. CPA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully stated herein.

59. CPA and CCTC are parties to the JVA.

60. The JVA is a valid and enforceable contract.

61. CPA fully performed under the JVA by beginning the process of obtaining the SBLC that would be used to fund the Joint Venture's projects. To the extent CPA was obligated to take any other actions related to the SBLC—including actions related to monetization—CPA was excused from performing based on CCTC's prior material breach.

62. Under the JVA, CCTC was obligated to provide the Joint Venture with viable projects to invest in. Indeed, CCTC expressly represented in the JVA that that "it has various projects and businesses under management" and that it "is confident in its portfolio projects companies."

63. CCTC further represented that it was "ready, willing, and able to receive [the] cash pool generated by [CPA's SBLCs]," including "a line of credit Twenty Million Dollars $20,000,000 to be used exclusive to grow the portfolio companies of [CCTC]."

64. CCTC materially breached the JVA by failing to provide the Joint Venture with any viable investment projects.

65. As a result of CCTC's material breach, the SBLC process could not be completed.

66. CCTC's material breach has caused CPA damages of not less than $3,500,000.00 from, among other things, lost revenue and lost opportunities that *CCTC claims* the Joint Venture would have realized absent CCTC's breach, with the exact amount to be proven at trial.

67. Moreover, if CCTC's representations about the value of the Timber Development project had been truthful, CCTC's breaches have caused CPA to suffer expectation damages of not less than $40,000,000.00 in lost profits, with the exact amount to be proven at trial.

///

///

10

## SECOND CAUSE OF ACTION

### Breach of the Implied Covenant of Good faith and Fair Dealing

68. CPA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully stated herein.

69. Each contract in Nevada carries an implied covenant of good faith and fair dealing.

70. CPA and CCTC are parties to the JVA, which is a valid and enforceable contract.

71. Based on the conduct described above, CCTC materially breached the implied covenant of good faith and fair dealing by acting in a manner that was unfaithful to the purpose of the contract, thereby denying CPA's justified expectations.

72. As a result of CCTC's conduct, CPA has suffered damages of not less than $3,500,000.00 from, among other things, lost revenue and lost opportunities that *CCTC claims* the Joint Venture would have realized absent CCTC's breach, with the exact amount to be proven at trial.

73. Moreover, if CCTC's representations about the value of the Timber Development project had been truthful, CCTC's breaches have caused CPA to suffer expectation damages of not less than $40,000,000.00 in lost profits, with the exact amount to be proven at trial.

## THIRD CAUSE OF ACTION

### Declaratory Relief

74. CPA repeats and re-alleges each and every allegation in the preceding paragraphs as though fully stated herein.

75. A justiciable controversy exists between CPA and CCTC regarding their respective rights and obligations under the JVA.

76. CPA has a legally protectable interest in this controversy.

77. CPA requests a declaration from the Court that once CPA began the process of obtaining the SBLC, CPA was not obligated under the JVA to take any additional actions related to the SBLC, including monetization, until CCTC provided a viable project that was ready to receive capital.

11

78.     This issue is ripe for judicial determination because CCTC has asserted that CPA breached the JVA based on a lack of monetization, despite the fact that CCTC never obtained a viable project that was ready to receive capital.

## PRAYER FOR RELIEF

WHEREFORE, CPA prays for the following relief against CCTC:

1.     An award of damages according to proof, but not less than $40,000,000.00;

2.     A declaration that once CPA begins the initial process of obtaining an SBLC under the JVA, it is not obligated to take any additional actions related the SBLC, including monetization, until CCTC provides a viable project that is ready to receive capital.

3.     For any further relief deemed to be just and proper.

DATED this 8th day of April, 2024.

BROWNSTEIN HYATT FARBER SCHRECK, LLP

*/s/ Eric D. Walther*
MITCHELL J. LANGBERG, ESQ.
Nevada Bar No. 10118
abult@bhfs.com
ERIC D. WALTHER, ESQ.
Nevada Bar No. 13611
ewalther@bhfs.com
BROWNSTEIN HYATT FARBER SCHRECK, LLP
100 North City Parkway, Suite 1600
Las Vegas, NV  89106-4614
Telephone:  702.382.2101
Facsimile:  702.382.8135

*Attorneys for Capital Pure Assets, LTD*

12